May it please the Court, and may I reserve five minutes for rebuttal. This case presents very important issues under the Freedom of Information Act, which this Court in Transgender Law Center underscored the importance of, as have many courts, that this Act is fundamental to our system of government, to the preservation of democracy, and to allow the public to have access to information that the government possesses, and to hold the government accountable. The District Court decision in this case is at odds with these fundamental principles recognized in Transgender Law Center, which should be controlling to at least some aspects of this case, as I will elaborate. There are six specific ways in which the District Court erred. One, in contrary to Transgender Law Center, endorsed the idea that merely briefing, merely deciding what to say to the outside world in response to a third-party inquiry is itself a deliberative process. And for that matter, even deciding what to say internally is a deliberative process, as opposed to actually taking action. The District Court further erred in not giving effect to Congress's important reform in the 2016 FOIA Improvement Act, where Congress recognized that the federal government and federal agencies had become too enamored of secrecy, and were withholding documents reflexively without real showing of harm. Third, the District Court erred in allowing the EPA, and by extension all federal agencies, carte blanche to have months or even years of delay in responding to Freedom of Information Act requests, in rejecting our pattern and practice of FOIA violation claim. Additionally, the District Court erred in not even ruling on our pattern and practice claim allegation that EPA was engaged in a pattern and practice of improperly withholding documents lawfully requested under the Freedom of Information Act. Could you show a pattern and practice and get injunctive relief in this case if the District Court properly concluded in this case that there were no improper withholdings here? Yes, because there still was an improper delay in responding to our requests that would give us standing to then assert the broader pattern of EPA's unlawful delay in responding to FOIA requests. And for our own requests... But if the District Court thought that part of the delay here was because your clients or you wouldn't agree to word searches, and I mean you may have a response about why you wouldn't agree to word searches, but the District Court looked at the back and forth between the sides on how these documents would be found, and thought that the agency had not improperly delayed. So if we take that as given, and you might have arguments why it's not true, but if we take that as given, could you still get injunctive relief in this case as opposed to some other case? Well, I think so, because we've demonstrated, the record demonstrated in this case, that EPA is engaged in a pattern and practice of not responding to our requests. I mean, this was one of the requests. And, again, the standard is pattern and practice of violating FOIA deadlines, and that's unassailable. That's not contested. I mean, the government at best would have an argument, well, we have an excuse for violating the law in this sense, but it was still... I mean, the pattern and practice is... I mean, the FOIA statute, the FOIA standard that sets the mandatory deadlines, doesn't say unless the federal agency has a good excuse for delaying. I mean, there are hard deadlines, 20 working days that can be extended to 30 working days, and then the district courts have discretion when sought to give longer time, which wasn't done here. So it's unassailable. There's no factual dispute that the FOIA statutory deadlines were not complied with here, which would give us standing to be here. And then, in addition, we have a pattern and practice of EPA not responding on time to our requests. I mean, we sued EPA four times under the Freedom of Information Act, and other than this case, the other three cases, we won. The district court agreed that EPA had improperly withheld documents and had not met its FOIA obligations. And did you seek injunctive relief in those cases? We, in a sense, yes. I mean, we asked for a mandate that the district court order EPA to turn over documents, and we got that relief from Magistrate Judge Miu in the Northern District. No, no, but you want injunctive relief, like, about how they should look at requests you haven't even made yet, right? That's the injunctive relief you want. Yes, to stop violating FOIA deadlines and to stop improperly withholding. You're not arguing that having a district court say you're entitled to document 347 is the equivalent of injunctive relief? Well, it's a mandate. I mean, it's an order. But you're asking for far more than here just getting particular documents. We are, and there certainly is precedent for that. I mean, the Ninth Circuit has recognized in the Hadro case and others that injunctive relief or a claim for a pattern of unreasonable delay in responding to FOIA deadlines is a cognizable claim and that there is a remedy for that claim. And the only remedy would be stop engaging in that pattern of practice. Don't repeatedly miss FOIA deadlines. The Ninth Circuit case to which you're referring is which case? I believe the Long case. It's in our briefs. But Hadro is another. The Animal Legal Rights Foundation case I thought was one that you cited, was it not? I'm sorry, Your Honor. I thought it was an Animal Legal Rights Foundation case or something to that effect. I think that might be. That might be the case you're referring to. That might be the one as well, Your Honor. That case had nothing to do with pattern of practice claims. It had to do with the order of the two-step process of FOIA claims. It wasn't a pattern of practice case. But certainly Hadro is a pattern of practice claim. And maybe I'm misremembering which case is which. But certainly the Ninth Circuit unequivocally has recognized a pattern of practice claim. Hadro was about standing, though, not about how the claim is evaluated on merits, right? I believe that's true, yes, at the appellate level, not at the district court level. But, again, it was part of the reasoning and the outcome is that the Ninth Circuit recognized that there is a pattern of practice claim. It does seem like Long sets out an analysis of how to look at a pattern of practice claim. And the district court did talk about Long and go through those steps, right? I believe that's right. But, again, we misapplied it in that the district court found there was no pattern of practice of violation, which is just fundamentally at odds with the facts. I mean, we've pointed out instances where the EPA is 2,000 days late in responding to FOIA requests. Mr. Sproul, let me ask you something. I'm trying to make sure I understand what the factual underline of all this is as we get deep into the weeds on the law. Essentially, EPA disclosed over 800 records, correct? And essentially at issue are the withholding or redacting, not withholding or redacting of some 645 under the Exemption 5 principles of privilege, right? That's what we're talking about here. That is what we're talking about in part, but not the only issue. In terms of the response of EPA, am I correct in understanding that the Vaughan Index that was created has some 650 pages in terms of explanation item by item under what's called the Vaughan Index? That's true, Your Honor, but it's a lot of cut and paste. I mean, the language is recycled over and over again. It was done with a word processor, obviously. I mean, it's conclusory and vague and broad. And I can cite specific examples, if I may. I'm just trying to make sure we're still in focus here. And in terms of the response of EPA, there's essentially the Porter Declaration, the Affidavit of Porter. Is that right? That's correct, Your Honor. Because that's part of your argument that allegedly there's some shifting of the burden here when there was a response. Your response to the government affidavit is that the burden is shifting to you, essentially. Isn't that what you're arguing? That's what the district court, in effect, did, yes. Just to get into the meat here in terms of shifting of the burden, how is it shifting of the burden if the government affidavit is extraordinarily detailed and responds? I'm not sure how a response by the petitioner in this case under FOIA to a government affidavit, I don't know how that amounts to shifting of a burden here. Because the Porter Declaration was not, in fact, extremely detailed and fact-specific. It was broad and vague and general. It certainly didn't go through 640-something documents and explain each one. I mean, it talked in very broad terms about eight categories of documents and used language that would be a stretch at best to say it was descriptive of what those documents actually included. And that was the work of the Vaughan Index. I'm not saying that the Porter Declaration needed to have done that. It would have been hundreds of pages. You're not saying that the Vaughan Index was unsatisfactory, are you? The Vaughan Index was most definitely unsatisfactory. And, again, it's long, but that doesn't mean length doesn't translate into content because it recycled the same language over and over again and described the documents in extremely broad and vague terms. And in terms that are contradictory, when you look at, at least in part, when you look at the actual unredacted portions of the documents and, well, with the Porter Declaration, I mean, this is a fundamental error that the district court committed, is when EPA declared in the Porter Declaration this discussion, for example, predated the eventual adoption of the 2019 DOJ memorandum. I mean, to back up, we're talking about there's three kind of decision documents, right? There's the two Sessions memos in 2017 and 2018, and then there's the DOJ memorandum in 2019. So the Porter Declaration says, for example, that Categories 3 and 4, EPA Categories 3 and 4, are documents that discuss the Sessions memoranda, but this was deliberative to the eventual adoption of the 2019 memoranda. And this is how we meet the Ninth Circuit and Supreme Court, for that matter, requirement that to be a deliberative process, the document must be pre-decisional. You must identify a particular decision that the document is pre-decisional to. And our argument is, well, when you look at the actual Vaughan Index and you look at the unredacted, the small unredacted portion of the document, there's no suggestion that those Category 3 and 4 documents were part of deliberating additional changes to FOIA policy. Are preliminary recommendations that are ultimately acted upon favorably, are they deemed to be, therefore, documents that are accepted by the EPA as in terms of a final position? Potentially. Potentially, but there are clearly documents that may be accepted by EPA and state its formal view, but there are other documents that may be preliminary recommendations that may or may not be acted upon favorably down the road, correct? Conceded, but again, a couple of very important points here. Number one, for a good chunk of the documents, we narrowed our request, and again, attempting to work with EPA's objections that we were seeking deliberative process. We only want the memoranda that deal with SEPs, supplemental environmental projects, that they included recommendations except this SEP and this settlement agreement that the EPA management accepted. So here's a memo that says, well, we think this is a good SEP. We think management, you should approve it. That's the kind of document that we're requesting and that may under the controlling the U.S. Supreme Court decision in Sierra Club might be a final decision document. What does the record reflect with respect to documents that were actually just adopted by EPA as its view, verbatim just adopt a document and state its view that was accepted in that fashion by EPA? I'm trying to focus upon the fact that you seem to place great emphasis in your briefing upon essentially the evolution of a policy, and I think the point I'm trying to make from my point of view is that preliminary recommendations that lead to certain policy in terms of analysis under a deliberative process privilege are different than documents that are accepted by EPA as its view. That may be an absolute verbatim document that's accepted and becomes the public view of EPA. That is different, it seems to me, than email communications and documents that lead that are preliminary recommendations or policy decisions or policy suggestions, and the policies may or may not be adopted, but they're not the same as a document that specifically is adopted verbatim by EPA, and I'm asking whether or not there's anything in the record here that I've not been able to find anything where you've identified any documents that actually were just accepted per se. Well, that would be an impossible – That's category two, under settlements. Yes, Your Honor. That would be an impossible burden for anyone to meet because of the nature of the Vaughn Index and the nature of the Porter Declaration. There's just – there's no explanation. I mean, and again, the Supreme Court has spoken in the Sierra Club decision that we don't look at the form, we look at the function of the document. So even, as you say, Your Honor, emails and so on, those could, under the Supreme Court standard in Sierra Club, be construed to be final decision documents if, for example, I was an environmental protection attorney for 15 years. I wrote many SEP memos. I'm well familiar with this sort of thing. And so I would write SEP memos to my bosses and say, This is a good SEP. I think we should approve it in this – With respect, there's supplemental environmental projects that are incorporated in a settlement. That's really what it comes down to, correct? That's what SEP is. Yeah, that's what a SEP is, Your Honor. So I wrote several – And if you, as an attorney, were writing a memo to a client saying, This is a good SEP. We should include it in a settlement. How is that not work product or attorney-client privilege? Well, whether it's attorney work product or attorney client would depend on the circumstance. It may qualify, but not necessarily. And the governing case here is the Coastal States case that was decided by the D.C. Circuit in 1980. It was recited over and over again. Everything that a government lawyer writes isn't necessarily attorney work product. But if you're advising how to settle litigation, that's core attorney-client privilege type advice, right? In a lot of circumstances, it would be. How can there be any circumstances in which it's not attorney-client privilege in terms of what you should or should not push for and what is achievable or not? How is any of that not attorney-client privilege? How could it be just some instances? I mean, define for me or all of us, how is that not attorney-client privilege? Certainly, aspects of it would be attorney-client protected, no doubt. But purely factual information that might be in it, if it didn't reveal the underlying legal analysis, would not be under controlling precedent. But if the attorney is analyzing the facts to make the recommendation, then the facts are going to be part of the recommendation. So I'm just having trouble with your argument because even if you might be able to carve out a few of these documents as not deliberative process privilege, the index designated these other privileges, too. And I think we're looking at this de novo. So if we should look at this and say, well, this description is clearly attorney-client privilege, even if it's debatable whether it's a deliberative process, then I don't think you're entitled to the document either way. And so why don't we just say, well, now this one is privileged and we can move on? Because you can't just move on because of the FOIA Improvement Act of 2016. I mean, the government, even if it's attorney-client or attorney-work product, the government still has to show foreseeable harm in releasing this. Remember, we're talking about... Your arguments about foreseeable harm I really had trouble with because you say they're all too vague because they only say this vague thing about the risk of confusion. But when I looked up the actual descriptions, there were, like, eight things listed for what the harms were going to be, and the last one was possible confusion. So even if we take out possible confusion, there was also discouraging chance between attorney and client, discouraging counseling and similar congressional inquiries, chilling deliberation. I mean, it wasn't only that. So then I don't know what to make of your argument about foreseeable harm. Well, Your Honor, if that is how a brief appeared to you, then it was perhaps inartfully drafted because I thought we were being clear that that was only one of many aspects of what is wrong with their foreseeable harm analysis. And, for example, an example that we stress is the government withheld a thank-you note and said, thank you for attending this meeting, and said there will be foreseeable harm if we release this language that says, thank you for attending this meeting. They inadvertently produced that thank-you language in another document. But then there's still redaction, right? So we don't know that they didn't say, at the meeting I learned this thing that affects my settlement deliberations, and here's why it really matters to our strategy. Right, but this is what's critical, FOIA and the case law is clear that the government can't withhold documents, whole documents. It can withhold content, information, not documents. So at least the thank-you portion of that document was clearly, there's no harm in revealing that an EPA administrative official thanked the Department of Justice. But didn't they release it in one place and then not another and then admit that it was a mistake? They've admitted in their reply briefing that it's a mistake, but the Vaughn Index remains uncorrected. And the district court found that the Vaughn Index justified withholding the thank-you note. And that remains the record. But we had other examples besides the thank-you note. And this should have raised district court awareness that the district court needed to look more carefully at these assertions. It didn't, it deferred automatically to these arguments from DOJ and EPA without looking at our counter inferences, like the fact that they thought a thank-you note would cause foreseeable harm should raise some red flags that you ought to look at some of these documents, which the district court declined to do. I think we better interrupt because you've used up your time. I'll still give you two minutes for rebuttal, but we're at time now. Thank you very much, Your Honor. Adam Jed Good morning, Your Honors. Adam Jed for the United States. Could you pull the microphone closer, I'm sorry. I apologize. There you go, that's all right. Can Your Honors hear me? Yeah, sure. Good morning, Your Honors. Adam Jed for the United States. May it please the Court. You know, I obviously know that the Court has heard a number of arguments this morning. I don't want to unduly take the Court's time. I did just want to flag one issue that maybe got a little bit lost in the colloquies that my friend was having with the Court about recommendations that have been acted on favorably. We do think that those recommendations would be covered by the attorney-client privilege or work product doctrine, but they are deliberative as well, and I think maybe in the back and forth, my friend was just kind of mixing up apples and oranges, and I just want to make sure that I can kind of clarify what's going on here. My friend is relying on the Supreme Court's decision in NLRB v. Sears  Those cases are not about somebody makes a recommendation and then the agency happens to do what they recommended, whether it's for the reason recommended or a different reason, who knows. Those are about something different. It's a kind of very specific FOIA doctrine called express adoption, where it's not just the agency does what was recommended to it, but the agency actually points to the recommendation and says that recommendation is our decision. So, I mean, this is kind of a rough analogy, but this is kind of like the difference between a law clerk writing a memo to a judge and a judge, you know, kind of going with the final disposition that the law clerk recommended, maybe for that reason, maybe for a different reason. And with your view in the former express adoption, we don't have that here. That's correct. That's correct. I mean, express adoption is when you have something, you know, again, to sort of chase down this analogy a little bit, a court of appeals decision that says, we affirm for the reasons given by the district court. They're essentially then making that the decision. But, you know, I don't think there's any kind of serious argument that we have that here. And I actually think the way to know that, then, is just the way that my friend is kind of backing into this entire argument, because what happened here is in preparation for litigation, he agreed not to challenge at least kind of some of the records that were at issue. And one of the things that he agreed not to challenge, he said, okay, fine, if the agency kind of never went along with a recommendation, then we're not going to challenge it. Now, these things aren't always kind of black and white. I mean, in addition to the fact that some of the agreements that my friend made were themselves a little bit opaque, necessarily, when you have deliberations, there are a lot of issues and a lot of subtleties. And so it's not just kind of very clear that something was accepted or not accepted in an abundance of caution when there was any conceivable question. EPA kind of assumes that the document was still at issue, prepared the Vaughn Index, and it ended up being part of the litigation. And I think my friend kind of from that agreement or kind of stipulation that he made on the front end is now trying to back into this argument. He's basically trying to say, well, because we agreed not to challenge things that weren't accepted, therefore, it must be that anything that's at issue was accepted. I don't think that necessarily follows from the stipulation, but more to the point, the kind of reliance on express adoption doesn't follow from that at all. Unless the court has any other questions, we're certainly happy to respond. Mr. Jett, let me ask you, in terms of some suggestions that some of the law is clear on this, it would seem to me that in light of the Congress passing the FOIA Improvement Act of 2016 and the matter of requiring an independent showing of foreseeable harm, it seems that the courts in this circuit as well as around the country have a difficulty exactly defining what is foreseeable harm in terms of definition. How do you define what foreseeable harm is? Do you want to offer us a definition to use? It seems like we're sort of making law here in terms of how to define this, and the courts have clearly grappled with it. It's hardly clearly defined. What is your view of it? You know, it's difficult to apply to any case, and I guess I'm going to sort of attempt to give an answer, but this may sound a little bit like a non-answer, which is I really would just start with the actual text of the FOIA Improvement Act, whether they reasonably foresee that disclosure would harm an interest protected by an exemption. I mean, in contrast to the actual application of a FOIA exemption, where it's kind of just clear application of fact to law, here the question is not kind of application of fact to law. The question is just did the agency think this, and then did the agency kind of have a reasonable basis to think this? Now, I think the standard that... I don't know if I quite want to say the D.C. Circuit has ultimately adopted, but at least the sort of standard that the D.C. Circuit has applied in a couple of the cases that we've relied on. I don't think that's strictly necessary, and I think if you just kind of parsed the text of the FOIA Improvement Act, you might see that maybe in an individual case you might need to make that kind of showing. But for the purposes of this case, it's really just not necessary for the court to address that at all. I mean, this is a case where... Mainly because that comes in under the deliberative process privilege apart from the attorney-client privilege and work product. It has nothing to do with those two privileges. It's strictly, as I understand it, the foreseeable harm analysis is under the deliberative process privilege, correct? I actually think for the Vaughn entries, the foreseeable harm analysis was with respect to each of the privileges that had been asserted. Yeah. So, I mean, you know, look, obviously, as is the case, I mean, really in any kind of litigation, but especially in litigation like this where you have so many different documents and so many different issues, you know, what was a 650-page Vaughn index easily could have been a 6,500-page Vaughn index or a 65,000-page Vaughn index. Everything could potentially be spelled out with kind of more granular detail. But I think if Your Honor does look at each individual Vaughn entry, when the agency kind of asserts a set of privileges and then discusses foreseeable harm, those foreseeable harms are linking up to all of the privileges. Now, there's necessarily some amount of logical overlap. Obviously, a lot of privileges, for example, are concerned with chill and, you know, if you have here kind of the very nature of this FOIA request is it's kind of looking at advice and decision-making being made by lawyers at EPA and DOJ. And so necessarily, you're going to get the kind of chill that's relevant to deliberative process. You're also going to get the kind of chill that's relevant to the attorney-client privilege. And to be clear, as I think some of the questions this morning indicated, it's not that the agency was just kind of arbitrarily saying when there's privilege, you therefore need to be concerned about chill. I mean, if you look at the relevant Vaughn entries, they really are talking about the specific kind of document, the specific kind of decision. I mean, you know, obviously, it's, as they say, you know, kind of predictions are hard, especially about the future. You know, you never know definitively 110% exactly what's going to happen if something, you know, goes out the door. But to the extent that you can kind of focus on a document and say, look, you know, this isn't some kind of sui generis 50-year-old document where kind of nobody would really care at this point. Say, you know, we really think that if this goes out the door, it would lead to a chill. Or if this goes out the door, it would lead to a sort of window into the specific kind of decision-making that we engage in time and time again that's more than sufficient under even the kind of highest standard that any court has enunciated. So it seems like maybe this question is going to go to what the new act means and not really something about the Vaughn Index. But I'm just having trouble. If you have, if you're saying the Vaughn Index, basically, like, this is a document that explains our attorney-client privileged strategy. And then you're going to say, and therefore, like, if we disclose it, we're breaking attorney-client deliberations and chilling. It's going to be basically restating the privilege. But the act seems to say you can't just restate the privilege. I feel like when I read your index, you could say it's restating the privilege. But I don't know what you can do other than restate the privilege. So now I don't really know what to say about this. I mean, I think Your Honor's question probably gets to the maybe kind of broader question of exactly what it is that the FOIA Improvements Act was doing. I mean, I can just sort of tell you, as a historical matter, what the FOIA Improvements Act was doing was codifying what had been an executive branch policy for a number of years beforehand, where basically what had happened was the executive branch had said, look, kind of every now and again, you come across a document where technically we could assert a FOIA exemption. But, you know, maybe it's just really unusual in some way, or maybe it's just kind of so stale. Actually, it turns out the FOIA Improvements Act has also created some other staleness requirements. But, you know, it was kind of so stale, it's kind of hard to imagine that if we release something X number of years later, in a Y situation, it would really kind of have much of an effect. And I think that's basically what the FOIA Improvements Act was trying to codify. Now, you know, I should say, in a case like this, where the FOIA request, by its very nature, is focused on this kind of legally-oriented decision-making, if you just look at the FOIA request, it kind of screams privilege and screams a number of different types. And these documents by the temporal... by the timetable, they can't be stale. Yes, that's correct. I mean, these are the kinds of documents where it's kind of pretty obvious that there would be these kinds of harm, you know, kind of chill harms or specific harms on agency decision-making, or, although now the Exemption 7 assertions have sort of fallen out, harms with respect to actually ongoing enforcement proceedings. I mean, I could imagine, in this case, the agency really have been kind of much more conclusory with respect to the FOIA Improvements Act. But, you know, again, I mean, I'm sure every member of this court has seen a lot of FOIA litigation over the years. I mean, in the kind of scheme of FOIA litigation, this is a pretty exemplary presentation by the agency, this kind of extensive categorization, document-by-document bond index, and certainly at the point that they're going document-by-document and explaining each of the privileges, then they went ahead and they kind of explained why it is that they foresee these various harms, and they, you know, attach that to the particular nature of each document. I think, following up on that, I find it somewhat curious and not humorous, but Category 8 involves deliberative process privilege with respect to EPAs preparing for testimony before Congress. That would make for a very interesting reading, I think, if we start to have various agencies disclose their preparation for appearing in front of certain committees. It would seem to me a little bit problematic. Well, I mean, you know, interesting or not, interesting or not, I do think it would be quite problematic. I mean, you know, I'm kind of happy to address the crux of that legal issue. I mean, the whole point of the deliberative process privilege is it's a form of executive privilege. It's meant to protect executive branch decision-making. Now, obviously, the executive does a lot of different things in addition to just making policy. I mean, in fact, actually, if you look at the Supreme Court's recent Fish and Wildlife decision, there, the Supreme Court kind of separately identifies kind of decisions about some set of things and then also decisions about policymaking. And, you know, as I think the Campaign Legal Center decision from the D.C. Circuit spelled out pretty clearly, even if you wanted to try to sort of start separating things, even if you wanted to try to say some decisions are about policy and some decisions aren't, inevitably, you're going to start to realize that something like even just general messaging to the public, which in and of itself you might think is important in a democracy, will also itself be kind of intertwined with policy decision-making. Unless the Court has any other questions, we're happy to rest on our briefs. Thank you. Thank you, Your Honors. I think we have two minutes. Yes, Your Honors. I wanted to emphasize a point that I was trying to make earlier is that, again, these memos are about policy that's been repealed. And the set memos that we were seeking deal with cases that have been fully settled. So the case law is clear that it's important to consider the context when looking at foreseeable harm. So this is information that... But I thought the reason that you said this wasn't moot was because these policies are not, are sort of partially gone and partially not gone. That's true. But the, well, the 2019 memo and the Sessions memos have been repealed. They are gone. There is still, the EPA has not fully reverted to the prior SEP policy approach. But the policies themselves, and the concern that, like Category 7, for example, this is documents about, well, what does the Sessions memo mean? How do we follow the Sessions memo? And EPA says if we were to reveal that, we would chill future advice about the Sessions memos. That's no longer policy. Well, aren't they saying chill future advice about any policy that might or might not be repealed in the future? I mean, wouldn't you want people to be candid without worrying about whether that's going to happen or not for every possible similar recommendation? But this runs afoul to the notion that deliberative processes don't include ongoing government examination. I mean, that kind of rule would swallow the FOIA Improvement Act altogether and say, well, it's conceivable that whatever we might say about something that was now passed might come back in the future, but that's not the standard. It's reasonably foreseeable harm. We must identify specific the content that's in this memo. I mean, if you were to look at those memos, undoubtedly you would say, well, the Sessions memo requires X, Y, and Z, so we have to do, you know, Q. And that's no longer the case. But I thought the reason you wanted the information was because you're worried something like the Sessions memo is going to come back. Well, there is, of course, that possibility, but that hasn't happened yet. And revealing this chill future discussion or deliberation is entirely speculative. And in any case, we don't have to demonstrate that, as you say, well, are these going to come back or not? That's not part of the test that's before the court. Again, is there foreseeable harm in releasing these particular documents? One other point, if I may... But thank you, both sides, for the helpful arguments. This case is submitted. And we are adjourned for the day. We'll go deliberate, and we'll come back for the students who I guess are returning. All right.
judges: FRIEDLAND, BENNETT, Bennett